WINTHROP (SULLIVAN v.). See Case No. 13,600.

---

## Case No. 17,901.

### WINTHROP v. UNION INS. CO.

[2 Wash. C. C. 7.][1]

Circuit Court, D. Pennsylvania. April Term, 1807.

MARINE INSURANCE — DEVIATION FROM COURSE — CONSTRUCTION OF POLICY—USAGE—DEPOSITION TAKEN UNDER COMMISSION.

1. Action on a policy of insurance on goods on board the ship Maryland, at and from New-York to the Cape of Good Hope, with liberty to proceed to, and trade at the Isle of France, and any other port or ports in the Indian seas, and at and from the ports she might go to, back to New-York; with liberty to touch and trade, as usual, on the outward and homeward voyages, for refreshments. The vessel touched at the Isle of France, thence to Trincomala, proceeded to Madras and sold part of her cargo, and went from thence to Tranquebar, where she took in goods and proceeded to Batavia; there she sold the remains of her original cargo, as well as the goods taken in at Tranquebar, and sailed from Batavia with a cargo purchased with the proceeds of her outward cargo, and of the goods taken on board at Tranquebar. After leaving Batavia, all the officers died; and before his death, the captain directed one of the seamen, who was ignorant of navigation, to take the ship to the Isle of France, and deliver her to the consul. She arrived there, and was despatched for New-York, under the command

[1] [Originally published from the MSS. of Hon. Bushrod Washington, Associate Justice of the Supreme Court of the United States, under the supervision of Richard Peters, Jr., Esq.]

of a British subject, but was lost on the voyage. Held, that the trading was within the terms of the policy. That the proceeding to the Isle of France, was not a deviation. That the acts of the consul, if irregular, could not prejudice the rights of the insured.

[Cited in Coles v. Marine Ins. Co., Case No. 2,988.]

[Cited in brief in Winter v. Delaware M. S. Ins. Co., 30 Pa. St. 337. Cited in Schroeder v. Schweizer Lloyd Transport, etc., Co., 60 Cal. 477.]

2. Evidence of a usage to explain some clause in the contract of insurance, is regular; but it can only be resorted to when the law is unsettled, and then the construction must be determined by the usage, and not by the opinions of witnesses.

[Cited in Folsom v. Merchants' M. & M. Ins. Co., 38 Me. 421. Cited in brief in Keener v. Bank of U. S., 2 Pa. St. 239; Walsh v. Homer, 10 Mo. 8.]

3. Depositions taken under a commission, issued to a place where the commissioners are prohibited executing the commission, taken according to the law of the place, in the presence of the commissioners, by the judge, may be read in evidence,

4. If all the interrogatories, either in form or substance, are not put to the witnesses, the evidence cannot be read.

[Cited in brief in Louden v. Blythe, 16 Pa. St. 538.]

5. It is no objection to reading a deposition taken abroad, that the witnesses had previously been examined and cross-examined under a commission in the United States.

6. The protest of some of the crew, taken at the Isle of France, was permitted to be read, to invalidate their evidence under a commission.

Action on a policy, of the 4th of January, 1804, entered into by the Union Insurance Company, on goods on board the Maryland, lost or not lost, at and from New-York to the Cape of Good Hope, with liberty to proceed to, and trade at the Isle of France, and any other port or ports in the Indian seas, and at and from the ports she might go to, back to New-York; with liberty to touch and trade, as usual, for refreshments, on the outward and homeward voyage. The policy was open, and 20,000 dollars were insured. The ship sailed from New York, on the voyage, about the latter end of December, 1803, and touched at the Cape of Good Hope; whence she departed, and touched at the Isle of France, and went thence to Trincomala, in the island of Ceylon. It did not appear that she traded at any of the above ports. From Trincomala, she went to Madras, where she sold a part of her cargo, and received in return an order on Tranquebar, a Danish port on the Coromandel coast, where she took in goods purchased with the above order, and then proceeded to Batavia; there she sold the residue of her American cargo, as well as that part taken in at Tranquebar, and invested the proceeds in a return cargo, and about 10,000 dollars in specie, on account of the plaintiff, and 4000 dollars belonging to the captain. The crew were generally sick at Batavia, and the first officer died there, or shortly after she sailed

on her return voyage. Before the ship had left the Straits of Sunda, the second officer, in a state of delirium, shot the master, Captain Wickham; and shortly after died. The master appointed an officer in his room, and being himself seized with a lock-jaw, and sensible of his danger, he called to him one of the seamen, Beardsley, a young man on board, and asked him if he could lay the ship's course for the Isle of France; and being answered in the affirmative, he directed him to conduct her to that island, and deliver her to the American consul at that place. The master shortly after died, before the ship had cleared tne Straits, and before any course had been laid. A council of the crew being called; they determined, in their situation, that it was best to go to the Isle of France; and, accordingly, Beardsley conducted her there in safety, and delivered her to Mr. Buchannan, the American consul. Mr. Sauliera, (the correspondent of the plaintiff, and to whom the captain, who was also the sole consignee. was recommended by his owner, in case he should want his assistance on the outward voyage,) claimed the right of taking the vessel and cargo; which, being resisted by Buchannan, the American consul, the question was brought before the court of admiralty of the island, where the possession and management of the vessel was decreed in favour of Buchannan. Buchannan obtained an order of the court for a survey of the vessel, and either upon the report made by the surveyors, or for some other reason, he thought the vessel was overloaded; and in order to lighten her, he sold a part of her cargo of sugar, and invested the proceeds, as well as the 14,000 dollars, and about 1600 dollars received from passengers, in a lighter load, consisting of indigo, &c. He employed a Mr. Adamson, a British subject, then in the island, to command and navigate the ship to New-York; and permitted some Englishmen, who had been prisoners in the island, to take their passage in the ship to New-York. The ship sailed from the Isle of France, and was lost on the American coast, within a day's sail of New-York. On notice of loss. a regular abandonment was made. The property of the plaintiff was admitted. One of the objections made by the defendants to paying the loss when the abandonment was made, was, that the ship when she left Batavia, was overloaded. But this was so clearly disproved by the evidence in the cause. that it was abandoned on the trial.

A number of depositions were taken and read. proving the facts above stated, which are noticed in the charge. The protest of Beardsley, and of most of the witnesses who have deposed in the cause, was read to discredit their testimony, as to the intention of Captain Wickham when he left Batavia. to call at the Isle of France. The defendants offered to prove by witnesses, a usage, in voyages like the present which prevented the selling on board of any part of the cargo at any intermediate port, at which the vessel was permitted to call. To prove that such evidence was proper, were cited Park. Ins. 30, 42, 45, 49; Johns. 333. The admission of the evidence was opposed by the plaintiff's counsel.

Before WASHINGTON, Circuit Justice, and PETERS, District Judge.

BY THE COURT. An usage to explain some clause in a policy, is proper. If the construction be doubtful, it is the safest guide, because most likely to accord with the intention of the parties; who, it is to be presumed, had a view to the usage when they contracted. But usage can only be resorted to where the law is doubtful and unsettled; and even then the construction must be determined by the usage, and not by the opinions of the witnesses, however respectable they may be. In this case, the usage which the defendant expects to prove, will not contradict, though it may qualify and explain the permission which is granted by trading at the ports in the Indian seas; and it will contradict no settled principle of law on that subject. The evidence, therefore is proper.

Witnesses were then examined who stated, that where the termination of the voyage was fixed, the permission to trade, was, according to usage, confined to ports in the line of the voyage; but where this was not the case, as in the present instance, the trading might be backwards and forwards, out of the line. They mentioned two cases, where the policies resembled the present, except that the insurances were upon time, and a trading, similar to that which took place in this case, was carried on, and not objected to; and concluded, generally, by saying, that such a trading, in such a voyage, and under such a policy, is considered lawful, within the general usage of trade.

The defendant's counsel then offered to read depositions taken under a commission to the Isle of France, which was opposed upon two grounds: first, that it was executed not by the commissioners named, but by the judge of the admiralty, or some tribunal of that nature in the island: second, that many of the interrogatories were not put to the witnesses. neither were they answered. As to the first objection, it appeared that the execution of a foreign commission at that place by individuals. was considered an assumption of sovereign power, which was not permitted to be exercised. The American consul, to whose management this business was entrusted, in pursuance of the advice of counsel, petitioned the judge of the court to execute the commission, which he did with great solemnity, in the presence of persons named in the commission: but the interrogatories were not all put in the form they were propound-

ed by the counsel in this country, and some of them were not put at all.

In support of the commission, it was argued that this was the best evidence, which, from the nature of the case, could be produced; and if it be rejected, it will be impossible, in this or any other case, to obtain testimony where the witnesses reside in any part of the French dominions. In the case of Church v. Hubbart, 2 Cranch [6 U. S.] 236, it was decided, that foreign laws must be proved like other matters of fact; but that, if such proof was unattainable, inferior evidence, even the certificates of a consul, might be admitted. As to the second objection, the interrogatories are informally put; yet, if they are substantially answered, it ought to be deemed sufficient; particularly in a case where the execution of the commission was taken from the persons named in it, by the imperious interference of a foreign power.

WASHINGTON, Circuit Justice, was of opinion that the first objection ought not to prevail. The object of courts is, that the administration of justice should not be impeded by difficulties of form. The substantial purpose for which a commission to examine witnesses is given, is to obtain the evidence of those witnesses fairly, fully, and impartially. The commission, the interrogatories, &c., constitute the form by which this purpose is to be effected. If the substance be obtained, but from imperious circumstances not controllable by the court, the form cannot be observed; a correspondent relaxation is proper, in order to prevent the courts of justice from being impeded. Upon this ground, which is rendered tenable by the general principles of law, the first objection ought to be overruled. A contrary decision might be productive of extensive mischief in commercial questions. But, whilst the form in which the commission is executed, may, in a case like the present, be disregarded; it is, nevertheless, the duty of the court to see that the evidence has been fully and fairly taken. If the interrogatories be substantially put, though not in the precise form in which they are propounded by the parties; and if it appear that they are answered by the witnesses, it will be sufficient. But they ought all to be put, and should be all answered; as well those of the one side, as those of the other. This is not the case, as to any of the depositions under this commission. To mention one instance, among many others, which might be selected from the commission. The witness, by a cross-interrogatory, is asked, if the Maryland came into the Isle of France from necessity. In answer to some other question, he states, incidentally, that she came in, having lost all her officers; and this is said to be an answer to the above question. But that question was calculated to draw from him every circumstance of necessity within his knowledge, such as stress of

weather, leakages, being overloaded, &c. Each party has a right to have full benefit of his interrogatories, and to have them fully answered. This objection, therefore, is conclusive against the depositions.

PETERS, District Judge, fully concurred in the opinion upon the last objection, but he was not perfectly satisfied as to the first; although he concurred, rather than divide the court.

A third objection was made to the reading of Beardsley's deposition, taken under this commission, that he had been previously examined and cross-examined, under a commission in the United States. But the court thought this no reason why his second deposition should be rejected. The protest of Beardsley and some others of the crew, stated, that the Maryland sailed from Batavia for the Isle of France, and that they believed this was the intention of Captain Wickham, that he might there dispose of part of the cargo. But in the depositions of the same witnesses, they declared that they did not swear to this protest, and that if it was interpreted to them they did not understand it, and would not have signed it if they had. But the judge who received the protest, certifies that it was interpreted to the appearers, and sworn to by them.

The counsel for the defendant, Dallas and Rawle, objected to the plaintiff's right of recovery, upon the ground of a deviation committed in three instances; 1st, in selling at Madras, buying at Tranquebar, and reselling at Batavia; 2d, in going to the Isle of France; 3d, in breaking bulk, and changing her cargo there. Second; that the policy was vacated by taking on board an English captain at the Isle of France. They cited, in support of the first act of deviation, Lafabre and Wilson, Park. Ins. 294; on the third, Park. Ins. 309, 310, 313; 2 Marshall Ins. 413; Park, Ins. 295; Esp. 610; 3 Esp. 257; 5 Esp. 56. Upon the second point, they relied upon the evidence to prove that she did not touch at the Isle of France from stress of weather, from being overloaded, or from the incapacity of the ship to proceed. The loss of officers was a mere pretence. The captain intended, when he left Batavia, to stop there. On the third point, they insisted that the American consul was to be considered as the agent of the insured, legally substituted as such by the captain, who united in himself the characters of master and consignee. If so, then the changing of the cargo, and taking in an additional cargo purchased with the 14,000 dollars, was clearly a deviation, and was committed by the plaintiff's agent. On the last point, they insisted that the putting on board an English commander increased the risk, inasmuch as it would, by an ordinance of Louis XV., have made her good prize had she been taken by a French cruiser.

For the plaintiff, these positions were controverted by Tilghman and Ingersoll, par-

ticularly as to the facts respecting the second ground of deviation. They denied that the captain had meditated a deviation, and insisted that the American consul was the agent of all parties concerned.

WASHINGTON, Circuit Justice (charging jury). The plaintiff has proved every thing necessary to his right of recovery; and the question is, whether by any act, inconsistent with his contract, he has discharged the underwriters from the obligation to indemnify him for the loss which has happened. The claim is resisted on account of three distinct acts of deviation; first, on the outward voyage, in buying and selling a cargo in the ports at which she was permitted to touch; second, in calling at the Isle of France on her return voyage; and, thirdly, in changing her cargo there, and the taking in a new cargo purchased with the specie brought from Batavia. Another objection is made to the recovery, upon the ground of the risk having been increased by taking on board, at the Isle of France, an English captain to command the ship home.

To understand the first objection under the head of deviation, we must attend to the nature of the voyage insured. What was it? From New-York to the Cape, with liberty to proceed to, and trade at the Isle of France, and thence to any port or ports in the Indian seas; and at and from the ports she might go to, back to New-York, &c. It is contended by the counsel for the defendants, that the permission to trade beyond the Isle of France, is merely constructive, and cannot be more extensive than the express permission to trade at the Isle of France; that though the plaintiff might have touched at as many ports as he pleased, in order to dispose of his outward cargo, yet he could only take in a return cargo at those ports, and had no right to dispose of any part of it at any port on the voyage: that a more extensive construction would be highly unreasonable, by prolonging and increasing the risk beyond the time and measure which could properly have been contemplated by the underwriters.

It may be well doubted, whether this increase of risk to the extent supposed, is not in a great degree imaginary. The buying and selling would be nothing more than a change of cargo, and it must always be the interest of the insured to terminate the voyage as soon as possible. But be this as it may, it is always in the power of the insurers to prevent the consequences of a protracted voyage beyond the period they may be willing to insure, by limiting the duration of the risk. Insurances upon time, seem to be peculiarly fitted to trading voyages, and in most cases accompany them. The only two instances mentioned by the witness called to prove an usage, as to voyages like the present, were insurances upon time. It is impossible for the underwriter to calculate the

period when a trading voyage will terminate; and it may, therefore, be prudent for him to say, that he will not take the risk longer than a fixed number of months, &c. But it is unnecessary to consider the extreme case mentioned by the defendant's counsel. It will be more prudent to confine our inquiries to the very case before us. Does the policy protect the selling at Madras? the investment of the proceeds of that sale in a cargo at Tranquebar, and the resale of it at Batavia? The first consideration is, do the words of the policy, properly construed by the rules of law, protect such a trading? If they do, then, secondly, is there any usage of trade which restrains the construction? First, the permission to trade at the Isle of France, ought, upon every principle of construction, to be carried forward so as to apply to the ports in the Indian seas; for, otherwise, the permission to go there would be a mere mockery. Indulgences granted by the underwriter, ought to be and certainly are always paid for by the insured; that of going to any port in the Indian seas, was no doubt, considered in the present policy. But the insured would never avail himself of the permission to go to ports in the Indian seas, unless for the purpose of trading. If, then, the policy is to be so construed, what does it amount to? A license to trade at the Isle of France, and at any port or ports in the Indian seas. If the insured might trade at those ports, he might buy and sell at them, not in the limited manner contended for by the defendant's counsel, but by repeated acts; for I state it, that buying and selling to this extent, is the very essence of trade. It is by repeated acts of buying and selling, and taking in barter, that trade is carried on; and therefore, the words used in this policy are broad enough in their general import to cover such a trading, unless they be restrained by usage, or other expressions used in the policy.

The words used in this policy describe the risk in its utmost latitude, both as to the course of the voyage, and as to the trading outward. As to the voyage, the termination not being stated, the vessel was unfettered as to its course; and this is an additional proof of the great latitude intended to be given to the insured. Second; is this construction opposed by any well established usage of trade? An attempt was made by the defendants to prove such an usage; but, so far as usage was proved at all, it was directly against the defendant, and in support of the construction given to the policy.

The calling at the Isle of France on the return voyage. It is in proof by the testimony of a witness, that the Isle of France is out of the direct course of the voyage from Batavia to New York; and without a stoppage there, would protract the voyage about twenty days. Permission to call at the Isle of France on the home voyage is not granted by the policy, and consequently the going thither was clearly a deviation. But a deviation, if committed against the will of the master, or even volun-

tarily, for the purpose of saving the property, is excused upon the ground that all the parties to the contract, impliedly consent to it for their mutual benefit. But then it must appear that the master, in making the deviation, acted bona fide, according to the best of his judgment, for the general benefit of all the parties concerned; and in estimating the fairness of the measure, it is proper to attend to his motives, to the end he had in view, and to the consequences. He may err in judgment; the necessity may not have been extreme; but a necessity or justifiable cause must exist, and must be satisfactorily proved. His real motive ought to correspond with the one assigned, or he will furnish strong ground of suspicion that he has not acted bona fide.

The instances of necessity which are generally met with, are stress of weather; injury sustained by the ship, which requires to be repaired; to avoid an enemy; going to join convoy, and the like. But these are only examples, which serve to illustrate the principle. There may be many other instances, where the necessity will be equally great, and equally valid, to excuse the deviation. Our inquiries will then be directed to the following points: What was the asserted object in calling at the Isle of France? Was it the real one? The first officer on board, then the second, and lastly the captain, all died before the vessel left the Straits of Sunda, and before the vessel's course had been shaped. Upon the death of the first officer, the captain had appointed another; but he seems never to have acted, and we never hear any thing further of him. The captain, previous to his death, but after he was seized with a lock-jaw, and when he was certain of dying in a short time; inquired of Beardsley, a young man, and a common seaman, if he could shape the course of the vessel to the Isle of France. Upon being answered in the affirmative, he directed him to conduct her thither, and deliver her to the American consul. Unless a deviation had been previously meditated by the captain, it is strongly to be inferred from his conduct on this occasion, that he thought Beardsley the most competent of the crew to navigate the vessel; but yet, that he had not sufficient confidence in his skill, to entrust him with the command further than the Isle of France, which was not much more than half the distance they had to run to the Cape of Good Hope. This opinion of the captain seems to have been confirmed by that of the crew, who, in a council called after the melancholy fate of the captain, determined, that in their situation, it was proper to go to the Isle of France. One of the witnesses has deposed, that if the crew had not been extremely good, he doubted if Beardsley could have conducted the vessel even to the Isle of France. This, then, was the situation of the vessel. What was the end proposed by going to the Isle of France? If the witnesses are to be believed, it was to be relieved from the danger to which the vessel and crew were exposed, by the unfortu-

nate loss of all the officers who could be depended upon. But was this the real purpose for going there? It is denied by the defendant's counsel, who contend that it was a mere pretext to conceal a previously formed plan of Captain Wickham, to go from Batavia to the Isle of France. If this should be made out to your satisfaction, it will be difficult to give credit to the necessity resulting from the loss of officers, which is assigned as an excuse for the deviation.

The evidence relied upon by the defendant is; first, a letter from the American consul to the plaintiff in which he states, as coming from Beardsley, that the vessel had come in on her voyage from Batavia to that island, in consequence of her being overloaded. It is strange that Beardsley should have assigned that as a reason, when it is admitted on all hands that she was not overloaded; and Beardsley, in his deposition, declared that he never heard of an intention to go to the Isle of France from any of the officers, and that she was not overloaded. Second; the reports of the persons appointed at the Isle of France to inspect the vessel, who state that she required repairs and lightening. This, however, is strongly opposed by other evidence taken in the cause. Third; a letter from Adamson to the plaintiff, after the loss, in which he states that the vessel sailed from Batavia to the Isle of France. But it is to be remarked, that Adamson was picked up at the Isle of France, after the arrival of the vessel; and, therefore, could not have known any thing which had previously taken place. Fourth; the journal of Beardsley, which is headed, "Journal of a voyage from Batavia to the Isle of France." You will judge what weight ought to be given to this evidence. Lastly, the protest of Beardsley, and of some of the crew, made at the Isle of France.

On this evidence it is proper to remark, that the court allowed it to be read for the purpose of discrediting the witnesses who had signed the protest, and given evidence in the cause; but not to establish any one fact. If it has the effect for which it was permitted to be read, then you will consider whether there is evidence sufficient, without the depositions of those persons, to prove the case, and to justify the motives of the deviation; but not whether the protest establishes the contrary; and in presenting this inquiry, it may be proper to attend to what all these witnesses have deposed; that they did not understand the paper as it was interpreted to them; if they had, they would not have signed it. Though I should be very cautious in crediting such testimony, in contradiction of the certificate of a foreign competent consul; yet the certificate, in this case, goes no farther than to say that the protest was interpreted and sworn to, which might be, and yet might not have been understood.

On the other side, you have heard the following evidence: first, two letters from Captain Wickham shortly before he left Batavia, in which he speaks of sailing on his return to New-York, and to touch at the Cape of Good Hope, in order to settle some business there. Whether he could have any motive to conceal from his owners his intent to go to the Isle of France, if he entertained it, you must judge. Second; the evidence of Beardsley, of the boatswain, and of one of the crew; who depose that they never heard of any intention to touch at the Isle of France, until after the captain was sick, and sensible of his danger. The boatswain states that he was told by the captain and mates that they were to return to New-York, and to touch at the Cape. These witnesses, as well as Captain Lacher, give the reasons for their belief, that the Isle of France was not in the contemplation of Captain Wickham. But what seems most strongly to corroborate the evidence of these witnesses, is the order given by Wickham to Beardsley, shortly before his death. The diffidence he manifestly indicated of Beardsley's skill to navigate the vessel, even as far as the Isle of France; his directions to deliver her, not to Mr. Sauliera, the correspondent of his owners, but to the American consul; not by name, for probably he knew neither his name nor character, but as distinguished by his official station, as the commercial agent of the United States; without a single direction what this public character was to do, after he had received possession. These circumstances seem strongly to persuade the mind, that the order to deviate grew out of the necessity of the case, and could not be the result of any previously formed intention. As to this, however, you are the proper judges.

Third; the changing of, and adding to the cargo at the Isle of France; trading, except for refreshments, not being permitted on the homeward voyage. The changing of the cargo was sufficient to avoid the policy, if, under the circumstances of the case, it were imputable to the plaintiff. The reason is, not that the risk insured is increased, but that it is not the risk insured; and, therefore, it could be no excuse to say that the load was lightened by the change. If a necessity exist to throw overboard, or to land a part of the cargo, the act of doing so may be excused; but, in this case, there is no evidence of any necessity to lighten the vessel. She is proved to have been tight, and fit to perform any voyage.

The next inquiry is, were the transactions at the Isle of France, imputable to the insured? Was the result varied by the act of any person representing him, and acting, constructively, as his agent? The affirmative is asserted by the defendants. Or did they result from a misfortune occurring in the voyage, which, for a time, took the property out of his possession, and afforded an occasion for the interference of a third person, acting for the benefit of all concerned. This is contended for on the part of the plaintiff.

This is a question, which, in point of law, presents the greatest difficulty in the cause. Let us go by steps. Had Captain Wickham lived, and done these things, the defendants would have been discharged. Had he authorized or permitted the American consul or any other person to do them, the consequences would have been the same. Had Beardsley been appointed by Captain Wickham his successor, generally, and had he done, authorized, or permitted the doing of these things, still the policy would have been avoided. But who was Beardsley, and what were his powers? He was a sailor, taken from the crew of the vessel, clothed by the captain with a limited authority to conduct the vessel to the Isle of France, and there to deliver her and the cargo to the American consul. The moment he executed this order, all his authority ceased, and he returned to his former situation of a common seaman. He gave and could give no power or authority whatever to the American consul. Who was Buchannan? Not the consignee or agent of the owners, either so appointed by them, or by the substitution of tne captain; who was, whilst living, both master and consignee. The captain clothed him with no special powers whatever; and if he possessed any, they were such as flowed from the necessity of the case, and from his official character as the commercial agent of the country he represented, and to which the vessel belonged. The vessel came to the Isle of France in distress—if you think, from the evidence, there existed a necessity strong enough to justify her going there; and, in such a situation, as required the American consul to take care of the vessel and cargo, and to afford his assistance to both. Wickham gave no directions to that officer; and, therefore, seems to have had nothing in view, but to call upon him to perform his duty as consul. He is no more to be considered as the agent of the plaintiff, than he would have been had the captain died without giving a direction, or if she had floated into the Isle of France, without officers, or without a crew. In addition to the circumstances of the case which threw her under his care, he states that he acted for the benefit of all concerned, and he acted too under the sentence of a competent tribunal, who vested him with the possession of the property.

The question of law, then, upon this point is, is the insured responsible for the conduct of third persons, done in consequence of a misfortune occurring in the voyage, from which misfortune alone, and not from any act of the owner or his agents, such third persons derived their power to inter-

fere? The court is of opinion that he is not. The decision of this point settles the only remaining one, the putting an English captain on board. Let this have been right or wrong, it was not the act of the assured, expressly or constructively.

To conclude. The first question is purely a question of law; as the defendant admits, that an usage, such as was stated in the opening, is not proved, and the law is in favour of the plaintiff. The second is a mixed question of law and fact. If you are of opinion, upon the whole of the evidence, that the going to the Isle of France was a measure of necessity, produced by the loss of officers, that the captain, who gave the order, and Beardsley, who executed it, acting according to their best judgment; were actuated by honest motives to promote the general benefit of all concerned, and did not assign this motive as a mere cover to a previously formed plan to go there: then this point is also in favour of the plaintiff; if your opinion upon the evidence should be otherwise, then it is in favour of the defendant. If your sense of the evidence upon the second point should be in favour of the plaintiff, and that the authority given to Beardsley was such as I have considered it, then the next question, in point of law; is also with the plaintiff.

The jury found a verdict for the plaintiff, the full amount of his demand.

WIRT (UNITED STATES v.). See Case No. 16,745.

WIRT (WARFIELD v.). See Case No. 17,174.

WIRTZ (JOY v.). See Cases Nos. 7,553 and 7,554.

WISCONSIN, The. See Case No. 6,317.